# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BARBARA W. COLLINS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00009 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Barbara W. Collins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."

-1-

*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Collins filed her application for DIB on March 18, 2004, alleging disability as of April 21, 2003, based on anxiety, uncontrollable anger, mild axonal neuropathy, joint pain and fibromyalgia. (Record, ("R."), at 50-52, 91.) The claim was denied initially and upon reconsideration. (R. at 33-35, 39, 40-42.) Collins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 43.) The ALJ held a hearing on August 26, 2005, at which Collins was represented by counsel. (R. at 578-639.)

By decision dated January 24, 2006, the ALJ denied Collins's claim. (R. at 18-25.) The ALJ found that Collins met the disability insured status requirements of the Act for DIB purposes through September 30, 2008. (R. at 24.) The ALJ found that Collins had not engaged in substantial gainful activity since April 21, 2003. (R. at 24.) The ALJ also found that the medical evidence established that Collins suffered from severe impairments, namely degenerative disc disease of the cervical/lumbar spine, bipolar disorder and diabetes mellitus, but she found that Collins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Collins's allegations regarding her limitations were not totally credible. (R. at 24.) The ALJ found that Collins had the residual functional capacity to perform simple,

-2-

noncomplex light work[1] that did not require climbing, that allowed the opportunity to change postural positions and that involved no more than minimal public contact or interaction with co-workers. (R. at 24.) The ALJ found that Collins could not perform her past relevant work. (R. at 24.) Based on Collins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Collins could perform, including those of a general office clerk and a records clerk. (R. at 24.) Thus, the ALJ concluded that Collins was not disabled under the Act and was not eligible for DIB benefits. (R. at 24-25.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Collins pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 6-11.) Collins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2007). The case is before this court on Collins's motion for summary judgment filed August 9, 2007, and the Commissioner's motion for summary judgment filed September 10, 2007.

## II. Facts

Collins was born in 1964, (R. at 50, 583), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(d). Collins has a high school education and computer training classes. (R. at 582, 587.) She has past relevant work as a customer service representative, a director's assistant, a secretary and an insurance claims

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

secretary.  (R. at 68-74.)

Robert Jackson, a vocational expert, testified at Collins's hearing.  (R. at 631-38.) Jackson was asked to consider a hypothetical individual of Collins's age, education and work experience, who had the residual functional capacity to perform simple, nonstressful, light work that did not require climbing, who could occasionally balance, kneel, crouch, crawl or stoop, who had a moderate reduction in her ability to concentrate and who required little contact with the public and co-workers.  (R. at 633-34.) Jackson testified that such an individual could perform jobs such as a general office clerk and a file clerk, both of which existed in significant numbers in the national economy.  (R. at 634-35.) When asked to consider the same individual who could perform sedentary[2] work, which did not require climbing and required only little interaction with the public and co-workers, Jackson testified that such an individual could perform the job of a records clerk. (R. at 635-36.) Jackson testified that the jobs of a general office clerk and records clerk should offer a sit/stand option. (R. at 636.) While Jackson testified that such an individual would not be able to perform the jobs if she were limited as indicated by the state agency psychologists, it should be noted that he was testifying based upon Collins's attorney defining "moderate" as "less than satisfactory."  (R. at 637.) The definition for "moderate" is not defined on the psychological report.  (R. at 403-04.)

---

[2]Sedentary work involves lifting items weighting up to 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2007).

-4-

In rendering his decision, the ALJ reviewed records from Dr. Robert Homer, M.D.; Carilion Rehabilitation Center; Dr. David A. Downs Jr., M.D.; Carilion Behavioral Health; Julie Jennings, Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Richard T. Williams, M.D.; Tuck Chiropractic Clinic; Carilion New River Valley Medical Center; Dr. Rollin J. Hawley, M.D., a neurologist; Dr. Suzanne F. Strong, D.O.; Dr. James M. Vascik, M.D., a neurologist; Dr. Garry E. Bayliss, M.D., a rheumatologist; Dr. Gary R. Simonds, M.D., a neurologist; N. Ray Tuck Jr., D.C.; and William Wellborn III, Ph.D., a clinical neuropsychologist. Collins's attorney submitted reports from Dr. Downs; Carilion Rehabilitation Center; Dr. Trevar O. Chapmon, M.D.; Rachel Moore, a graduate trainee; and Lee D. Cooper, Ph.D., a licensed clinical psychologist.[3]

On May 28, 2002, Dr. Robert Homer, M.D., reported that Collins's bipolar disorder was very stable on her current regimen and that Collins had stopped going to psychotherapy. (R. at 170.) Collins reinstituted psychotherapy in September 2002 due to increased stressors at home. (R. at 169.) In April 2003, Collins complained of "much stress" at home involving her in-laws and the possible incarceration of her stepson. (R. at 162.) In May 2003, Collins complained of being overwhelmed, and it was recommended that Collins restart psychotherapy. (R. at 160.) Collins was diagnosed with moderate bipolar disorder, mixed type. (R. at 160.)

---

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-11), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

The record shows that Collins was treated by Dr. David A. Downs Jr., M.D., for bipolar I disorder. (R. at 148-59, 163-64, 227-28, 231-32, 235-36, 238-39, 428-49, 498-504.) Although it appears that Dr. Downs treated Collins for a number of years, the record does not contain any assessment by him of her work-related abilities. In June 2003, Dr. Downs reported that Collins maintained good eye contact and exhibited only mild tension. (R. at 158.) Her flow of thought appeared rapid with perhaps a minimal flight of ideas. (R. at 158.) Dr. Downs diagnosed moderate to severe bipolar disorder, without psychotic features. (R. at 158.) He also noted "patient will continue to be unable to work" without any further explanation or restrictions. (R. at 159.) On August 19, 2003, Dr. Downs noted that Collins continued to be unable to work. (R. at 155.) On September 17, 2003, Collins reported that she felt slightly less depressed and that her sleep had improved. (R. at 151.) She reported continued difficulty with racing thoughts, and her concentration was very poor. (R. at 151.) Dr. Downs reported improvement in Collins's clinical examination, including lessened psychomotor restlessness and tension and a clearer flow of thought. (R. at 151.) He reported that Collins demonstrated difficulty maintaining attention and concentration. (R. at 151.) On September 24, 2003, Collins reported that she was feeling well. (R. at 150.) Collins specifically denied depression. (R. at 150.) She reported that her last episode of depression was in March 2003. (R. at 150.) Dr. Downs diagnosed Collins's bipolar disorder as stable. (R. at 150.) On October 15, 2003, Dr. Downs saw Collins for her complaints of depression. (R. at 148.) He reported that Collins's grooming was slightly disheveled. (R. at 148.) Dr. Downs diagnosed bipolar I disorder, depressed, severe, without psychotic features. (R. at 149.) In November 2003, Collins reported that she was "hanging in there." (R. at 238.)

-6-

On December 11, 2003, Dr. Downs noted some discrepancies in the statements Collins had made to his office. For example, Collins told Dr. Downs that she was not sleeping well. (R. at 235.) Dr. Downs reported that this "refutes" a statement Collins had made to his office nurse 10 days earlier, when she asked for a refill of her sleep medication. (R. at 235.) Collins's flow of thought was clear without gross slowing, her affect was mildly restricted, but she was alert and oriented. (R. at 235.) Dr. Downs determined that Collins's bipolar disorder was at a moderate level, and he adjusted her medication regimen. (R. at 235-36.) On January 19, 2004, Collins reported improvement in her anxiety, and she denied any irritability. (R. at 231.) Her thought processes were relatively clear. (R. at 231.) Her attention span was normal and her concentration was only slightly reduced. (R. at 231.) In February 2004, Dr. Downs adjusted Collins's medication regimen. (R. at 228.) In May 2004, Collins reported that her sleep had improved. (R. at 448.) There was some mild tangentiality to her thinking and rumination, but no significant flight of ideas. (R. at 448.) Dr. Downs adjusted her medication regimen. (R. at 449.) In June 2004, Collins reported that she was "definitely not as agitated" as before, her irritability had lessened, her functioning had improved, her sleep was better and she was "okay" with some people. (R. at 446.) Dr. Downs rated Collins's bipolar disorder as mild. (R. at 446.)

On August 2, 2004, Collins reported no significant change in her condition. (R. at 444.) On August 31, 2004, Collins reported that her mood was stable, she denied any significant irritability and reported that her depression had lessened. (R. at 442.) Dr. Downs found Collins's bipolar disorder was "clearly improved." (R. at 442.) In September 2004, Collins reported a "great deal" of stability in her mood and less irritability in her condition. (R. at 440.) She denied being anxious and reported that

-7-

she slept "very well." (R. at 440.) Dr. Downs rated Collins's bipolar disorder as mild and improved. (R. at 440.) In November 2004, Collins described her mood as "fairly stable" with no depression or overall irritability. (R. at 438.) Dr. Downs reported that Collins's bipolar disorder was in partial remission. (R. at 439.) In January 2005, Collins reported that she went to Charlotte, North Carolina, to attend the "Easy Rider Bike Show." (R. at 457.) In February 2005, Collins complained of worsening in her condition. (R. at 435-37.) Dr. Downs referred Collins for an outpatient consultation with a bipolar disorder or mood disorder expert. (R. at 436.) The results of this consultation indicated that Collins did not have a bipolar disorder but, rather, a recurrent major depressive disorder, a dysthymic disorder, social phobia and a borderline personality disorder. (R. at 432-33.) Dr. Downs disagreed with the consultative examiner's finding and maintained Collins had a moderate bipolar disorder. (R. at 433.) In May 2005, Collins denied experiencing any anxiety or irritability. (R. at 430.) On mental status evaluation, her sensorium was clear and her cognition was intact to simple testing. (R. at 430.) Dr. Downs diagnosed Collins's bipolar disorder as mild. (R. at 431.) In June 2005, Dr. Downs diagnosed bipolar I disorder, mixed episode, moderate, social phobia and likely a personality disorder, not otherwise specified. (R. at 429.)

In September 2003, when Collins saw Dr. Suzanne F. Strong, D.O., she denied being depressed, anxious or agitated. (R. at 289-92, 310-11, 315-17.) Her judgment and memory were intact. (R. at 291, 310, 316.) On March 17, 2004, Dr. Strong referred Collins for a series of diagnostic studies. (R. at 181-83, 255-61.) An MRI of Collins's cervical spine indicated degenerative changes at the C4-C5 and C6-C7 disc levels, but there was no impression upon her spinal cord. (R. at 181, 255.) She had

a protruding disc at C5-C6, but there was only a mild impression upon her cord. (R. at 181, 255.) An MRI of Collins's lumbar spine showed no signal abnormality within her vertebral bodies and normal maintenance of her vertebral body heights. (R. at 181, 255.) She had mild protruding and slight bulging disc at the L4-L5 level resulting in some mild impression upon her thecal sac. (R. at 181, 255.) On November 11, 2003, Collins complained of depression and anxiety, but Dr. Strong noted none on mental status examination. (R. at 279.) On November 26, 2003, Collins denied being depressed, anxious or agitated. (R. at 273.) Her memory and judgment were intact. (R. at 279.) On March 8, 2004, Collins complained of pain and numbness in her neck, hips and back, depression and anxiety. (R. at 263-65.) She had normal heel to toe gait. (R. at 264.) She had normal tone and strength in all extremities. (R. at 264.) No depression, anxiety or agitation was noted. (R. at 264.) On March 31, 2004, Collins complained of fatigue, back and joint pain, arthritis and memory loss. (R. at 248-49.) She denied anxiety and depression. (R. at 248.) Dr. Strong reported no signs of mood, thought or memory difficulty. (R. at 248.)

On September 19, 2003, Collins was admitted to Carilion New River Valley Medical Center for complaints of increased swelling in her lower leg. (R. at 190-201.) Lab results showed that Collins's liver function test were elevated. (R. at 190.) It was indicated that Collins's elevated liver functions were due to side effects of her medications. (R. at 195.) An ultrasound of Collins's abdomen was within normal limits, and her echocardiogram was unremarkable. (R. at 199-200.) Collins denied being depressed, anxious or agitated. (R. at 290.) Her memory and judgment remained intact. (R. at 291.)

The record shows that Collins was treated by Carol Rupe, L.C.S.W., a licensed

-9-

clinical social worker for Carilion Behavioral Health, from October 2003 through June 2005 for her bipolar disorder.  (R. at 224-26, 229-30, 233-34, 237, 240-46, 451-66, 483.)

In November 2003, Collins was in an automobile accident. She complained of multiple pains, but her mandible, chest and cervical and lumbar spine x-rays were normal.  (R. at 173, 188-89.) Collins underwent chiropractic treatment, including acupuncture, which improved her condition.  (R. at 173, 364-78, 412-20.) Collins had normal alignment and mobility of her head and neck. (R. at 273.) Her range of motion and strength of her upper and lower extremities, her gait and station were normal.  (R. at 273.)

On March 3, 2004, Dr. Rollin J. Hawley, M.D., a neurologist, evaluated Collins. (R. at 173-80.) Dr. Hawley reported that Collins had tender, arthritic nodes of the distal interphalangeal joints more than proximal interphalangeal joints of all of her fingers. (R. at 174.) Nerve conduction studies and an EMG showed mild sensorimotor axonal neuropathy of unknown cause, which probably caused most of her diffuse muscle pain and familial erosive osteoarthritis, possibly psoriatic. (R. at 175, 177.) Straight leg raising tests were negative. (R. at 175.) Dr. Hawley determined neuropathic pain was not a particular problem.  (R. at 175.)

On April 7, 2004, Dr. James M. Vascik, M.D., a neurologist, evaluated Collins. (R. at 358-60.) Collins exhibited full range of motion of her neck, shoulder, elbow and wrist.  (R. at 358.) Collins had sensory loss in her right hand, but in a nondermatomal pattern.  (R. at 358.) She exhibited good flexibility of her lumbar spine and walked on her heels and toes.  (R. at 358.) Dr. Vascik reported that Collins's MRI results showed

-10-

C5-C6 degenerative changes appropriate for her age. (R. at 358, 363.) Dr. Vascik reported that Collins exhibited no true disc rupture, and there was no nerve root compression. (R. at 358.) Surgery was not recommended, and an epidural steroid injection was administered. (R. at 358, 450.)

In May 2004, Dr. Garry E. Bayliss, M.D., a rheumatologist, evaluated Collins. (R. at 406-11.) Dr. Bayliss reported that Collins had equivocal changes in her hands and feet with subjective decrease in her light touch sensation. (R. at 409.) She had normal muscle strength throughout. (R. at 409.) Dr. Bayliss diagnosed fibromyalgia syndrome and osteoarthritis. (R. at 409.) He recommended conservative treatment. (R. at 408-09.)

On May 6, 2004, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Collins suffered from an affective disorder. (R. at 387-401.) Jennings indicated that Collins had moderate restrictions in her activities of daily living, in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 398.) Jennings determined that there was insufficient evidence to determine if Collins ever experienced episodes of decompensation. (R. at 398.) This assessment was affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on July 14, 2004. (R. at 387.)

Jennings also completed a mental assessment indicating that Collins was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to

-11-

work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to set realistic goals or make plans independently of others. (R. at 403-04.) Despite these limitations, Jennings opined that Collins was restricted to working simple, unskilled, nonstressful work. (R. at 404.)

On May 8, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Collins had the residual functional capacity to perform light work. (R. at 379-86.) Dr. Johnson reported that Collins could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 381.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 382-83.) Dr. Johnson reported that the record did not document or support severe functional limitations that would preclude all work activity. (R. at 384.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician, on July 14, 2004. (R. at 386.)

In February 2005, Dr. Gary R. Simonds, M.D., a neurologist, evaluated Collins. (R. at 421-23.) Physical examination was unremarkable. (R. at 421.) Her motor and sensory examinations were normal. (R. at 422.) Dr. Simonds reported that Collins's MRI results showed a "very good-looking" lumbar spine with a relatively well-preserved lordosis. (R. at 422.) He reported that Collins had a mildly degenerative L4-L5 disc with some protrusion, and he found no evidence of significant nerve root compression. (R. at 422.) Dr. Simonds recommended conservative treatment. (R. at

-12-

422.)

In July 2005, N. Ray Tuck Jr., D.C., indicated that he had treated Collins from November 2003 through December 2004 for cervical sprain/strain, interovertebral disc disorder, supraspimatus sprain. (R. at 467-71.) He indicated that Collins's impairments could be expected to least at least 12 months. (R. at 467.) Tuck reported that Collins's emotional factors did not contribute to the severity of her symptoms and functional limitations. (R. at 468.) He found that Collins's pain constantly interfered with her attention and concentration and that she was incapable of performing even low-stress jobs. (R. at 468.) Tuck identified no specific restriction in Collins's ability to sit, stand and walk. (R. at 468-69.) He indicated that Collins needed to be able to shift positions at will and to take unscheduled breaks as needed. (R. at 469.) He indicated that Collins could occasionally lift and carry items weighing up to 10 pounds, rarely lift and carry items weighing up to 20 pounds and never lift or carry items weighing 50 pounds. (R. at 469.) He indicated that Collins could occasionally twist, stoop, crouch, squat and climb ladders and stairs. (R. at 470.)

In August 2005, William Wellborn III, Ph.D., a clinical neuropsychologist, wrote a report summarizing the results of his three-day neuropsychological evaluation. (R. at 488-95.) Wellborn reported that Collins did not put forth "good effort" during testing. (R. at 489.) He indicated that Collins tended to "give up" and say "don't know" a lot. (R. at 489.) Her effort and motivation were "significantly compromised." (R. at 490.) This was confirmed by, for example, the results of the computerized assessment of response bias test, which revealed random or no effort. (R. at 490.) Interpretation of Collins's performance revealed that she gave "extremely poor effort." (R. at 490.) Wellborn reported that Collins's effort was "very far below" those

-13-

individuals who have sustained a severe brain injury and was, in fact, within the random range of response comparable with a three-year old who was simply pressing keys randomly.  (R. at 490.)  Wellborn reported that Collins's profile was suggestive of someone who was attempting to simulate, exaggerate or malinger cognitive deficits, and it indicated a "complete lack" of compliance with the assessment process.  (R. at 490.)  Wellborn reported that it was very likely that litigation or other factors, which would include secondary gain, were motivating factors.  (R. at 490.)  In order to confirm the accuracy of this profile, Wellborn administered the Word Memory Test, which indicated that Collins responded in a fashion that was consistent with a pattern of someone who was "blatantly" simulating cognitive deficits and was "often" known to be malingering.  (R. at 490.)  Wellborn diagnosed traumatic brain injury secondary to motor vehicle accident, bipolar disorder, somatization disorder and pain disorder associated with both psychological factors and general medical condition.  (R. at 495.)  Wellborn noted that, given Collins's poor effort, he was not sure if she had any cognitive problems.  (R. at 495.)

On April 18, 2006, Rachel Moore, a graduate trainee,[4] and Lee D. Cooper, Ph.D., a licensed clinical psychologist, evaluated Collins.  (R. at 539-46.)  The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and Collins obtained a verbal IQ score of 81, a performance IQ score of 87 and a full-scale IQ score of 83.  (R. at 541.)  The Millon Clinical Multiaxial Inventory Third Edition test, ("MCMI-III"), indicated that Collins possibly was "faking bad" or over reporting her symptoms.  (R. at 543.)  Moore and Cooper reported that, while it was possible that Collins over reported her symptoms, many of her elevated scores on the

---

[4]This psychological evaluation was part of a graduate class requirement. The testing was for training purposes only. Collins underwent the evaluation as a volunteer, as she was not referred for a specific reason.  (R. at 539.)

MCMI-III were concurrent with her reported and diagnosed problems. (R. at 544.) Collins was diagnosed with recurrent, severe major depressive disorder without psychotic features and anxiety disorder, not otherwise specified. (R. at 545.) Collins had a then-current Global Assessment of Functioning, ("GAF"), score of 40.[5] (R. at 545.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

_____

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV at 32.

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 24, 2006, the ALJ denied Collins's claim. (R. at 18-25.)  The ALJ found that the medical evidence established that Collins suffered from severe impairments, namely degenerative disc disease of the cervical/lumbar spine, bipolar disorder and diabetes mellitus, but she found that Collins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.)  The ALJ found that Collins had the residual functional capacity to perform simple, noncomplex light work that did not require climbing, that allowed the opportunity to change postural positions and that involved no more than minimal public contact or interaction with co-workers. (R. at 24.)  The ALJ found that Collins could not perform her past relevant work.  (R. at 24.)  Based on Collins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Collins could perform, including those of a general office clerk and a records clerk. (R. at 24.)  Thus, the ALJ concluded that Collins was not disabled under the Act and was not eligible for DIB benefits.  (R. at 24-25.)  *See* 20 C.F.R. § 404.1520(g) (2007).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

-16-

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

Collins argues that the ALJ erred in failing to give proper weight to the opinions of her treating psychiatrist, Dr. Downs. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-16.) Collins also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 16-18.)

Collins argues that the ALJ erred by failing to give proper weight to the opinion of Dr. Downs. (Plaintiff's Brief at 13-16.) Based on my review of the record and the ALJ's opinion, I disagree. Under 20 C.F.R. § 404.1527(d), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. The ALJ noted that the "records from the treating psychiatrist indicate that bipolar disorder, which has been found to be mild and in partial remission on occasion, is no more than moderate in severity." (R. at 23.) Nonetheless, the ALJ gave greater weight to the opinions of the state agency reviewing psychologists in determining that Collins's bipolar disorder was a severe impairment that caused significant vocationally relevant limitations. (R. at 21, 23.)

While the severity of Collins's mood disorder generally fluctuated with the amount of situational stressors in her life, (R. at 148-49, 151-21, 154-59, 227-28, 231-32, 235-36, 238-39, 428-49, 498-504), the ALJ concluded that Collins's bipolar disorder was at no more than a moderate level of severity, in concurrence with Dr. Downs's treatment notes. (R. at 23.) These treatment notes revealed the severity of Collins's condition lessened as Dr. Downs was able to achieve better pharmaceutical management over it.[6] (R. at 228, 232, 235, 429, 431, 433, 436, 439-40, 442, 446, 499, 502, 504.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). In fact, by August 2004, Collins's bipolar disorder began going into remission. (R. at 439-40, 442.) Overall, Collins's mood was fairly stable, (R. at 438, 440), she reported a lessening of her anxiety, (R. at 231, 430), and irritability, (R. at 430, 440, 442, 446), and improvement in her sleep. (R. at 228, 430, 438, 442.) She was socially appropriate, (R. at 432, 435), her attention was normal, her concentration only slightly reduced, (R. at 231), and her memory was intact. (R. at 436.) These findings are

---

[6]In May 2002, Dr. Homer also noted that Collins's bipolar disorder was very stable on her medication regimen. (R. at 170.) In September 2003, Collins denied being depressed, anxious or agitated. (R. at 291.) Her memory and judgment were reported as intact. (R. at 291.)

consistent with the findings of the state agency psychologists, who found that Collins was capable of performing simple, unskilled, nonstressful work.  (R. at  404.) Based on this, I find that substantial evidence exists to support the ALJ's weighing of the evidence.

Collins also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 16-18.)  The ALJ found that Collins had the residual functional capacity to perform simple, noncomplex light work that did not require climbing, that allowed the opportunity to change postural positions and that involved no more than minimal public contact or interaction with co-workers.  (R. at 24.) While Collins was involved in a motor vehicle accident in November 2003, she underwent chiropractic treatment, which improved her condition. (R. at 173, 264-78, 412-20.) The record shows that Collins had normal alignment and mobility of her head and neck.  (R. at 273.) She had normal range of motion and strength of all extremities.  (R. at 273.) Although Tuck opined that Collins could not perform low-stress jobs, the ALJ rejected this assessment because it was inconsistent with the objective medical evidence of record and the opinions of the reviewing state agency physicians.  (R. at 23, 468.) In March 2004, an MRI of Collins's cervical spine showed C4-C5 and C6-C7 degenerative changes appropriate for her age and a protruding disc that had only a mild impression upon her cord.  (R. at 181, 255, 358, 363.) An MRI of Collins's lumbar spine showed mild protruding and a slight bulging disc at the L4-L5 level.  (R. at 181, 255.)

In April 2004, Dr. Vascik reported that Collins exhibited no true disc rupture and no nerve root compression.  (R. at 358.) In February 2005, Dr. Simonds reported a normal examination.   (R. at 421-23.) He reported that Collins had a mildly

degenerative L4-L5 disc with some protrusion, and he found no evidence of nerve root compression. (R. at 422.) He recommended conservative treatment. (R. at 422.) The state agency physician opined that Collins could perform light work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling. (R. at 379-86.) The ALJ relied upon the assessments of the reviewing psychologists to determine Collins's residual functional capacity. Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding with regard to Collins's residual functional capacity.

For all of the above-stated reasons, I find that substantial evidence exists to support the ALJ's finding that Collins had the residual functional capacity to perform simple, noncomplex light work that did not require climbing, that allowed the opportunity to change postural positions and that involved no more than minimal public contact or interaction with co-workers.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the ALJ's finding with regard to Collins's residual functional capacity; and

2.  Substantial evidence exists to support the ALJ's finding that Collins was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Collins's motion for

summary judgment, grant the Commissioner's motion for summary judgment and affirm the decision of the Commissioner denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    This 9th day of June 2008.

/s/   *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE